***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications; therefore, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner
 ***********
The Full Commission finds as fact and concludes as matters of the law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury by accident, on or about October 1, 1998, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, the defendant employed three or more employees, and the employer-employee relationship existed between the defendant and plaintiff.
2. The defendant is a duly qualified self-insured employer under the North Carolina Workers' Compensation Act.
3. Plaintiff's average weekly wage may be determined by the Industrial Commission from an accurate Commission wage chart, Industrial Commission Form 22, prepared by defendant.
4. Plaintiff was out of work from January 21, 1999 through May 9, 1999, from November 29, 2000 through March 18, 2001, and from May 14, 2001 through the date of the hearing. Plaintiff also was out of work during holidays, vacation and weekends, from December 25, 1998 through January 10, 1999 and on vacation from March 19 through March 25, 2001.
5. Plaintiff was paid weekly short-term disability benefits under a plan funded solely by the defendant. Defendant shall be entitled to a credit for these payments against any workers' compensation awarded for this same period. Payments were as follows: $240.00 per week from January 21, 1999 through May 9, 1999, $280.00 per week from November 29, 2000 through March 18, 2001, and $290.00 per week from May 14, 2001 through the date of the hearing.
6. Documents stipulated into evidence include the following:
a. Plaintiff's Exhibits 1 through 24;
b. Defendants' Exhibits 1 through 3, and 5.
7. The depositions of Dr. Michael King and Dr. Charles Taft are a part of the evidentiary record in this case.
 ***********
Based on the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing in this matter, plaintiff was fifty-six (56) years old. Plaintiff completed the twelfth grade in school and has worked for twenty-nine (29) years at defendant's Winston-Salem facility. In October and November 1998, plaintiff was working as a tool crib attendant. Prior to October 1, 1998, plaintiff had not experienced problems with her right knee.
2. The job of tool crib attendant requires frequent standing. In addition, plaintiff's job duties included lifting and moving boxes as heavy as approximately 45 pounds on an occasional basis and waiting on other employees requesting tools and supplies on a daily basis.
3. Based on the wage chart prepared by defendant, plaintiff's average weekly wage is $758.73, yielding a compensation rate of $505.85.
4. On or about October 1, 1998, plaintiff had finished waiting on a customer at the tool crib window. As she returned to her desk to write down the order, her left toe caught on some pipes protruding from her desk. As she tried to avoid falling on some saw blades and other objects nearby, plaintiff twisted her body to the side and fell to the concrete floor, landing on her elbows and knees.
5. Plaintiff felt pain in her left elbow and right knee and her elbow was bleeding. Plaintiff was also limping because of the pain in her right knee.
6. While plaintiff was in the bathroom washing the blood from her elbow, Pam Polk, a member of the defendant's emergency response team, came into the bathroom. Ms. Polk works in the plant and also has the responsibility of responding to first aid needs of employees. These responsibilities include completing a report if first aid services are rendered. Ms. Polk asked plaintiff if she was okay, provided some ointment for plaintiff's elbow, and suggested that plaintiff fill out an accident report. Plaintiff told Ms. Polk she did not think that would be necessary because she thought she was okay. Plaintiff did not know how important it was to fill out a report.
7. During her lunch break, plaintiff called her sisters and told them of her fall. Also on the same day, plaintiff told fellow employees Walter Johnson and Ny Nguyen she had fallen. She showed Mr. Johnson her elbow and her knee and Mr. Johnson noted that the knee was swollen.
8. That evening, both shift supervisors in the work area asked plaintiff why she was limping and she told them she had fallen. The following day, plaintiff told co-workers Martha Slater and Peggy Dezern of her fall. Plaintiff's supervisor, Edith Holder, was nearby during the conversation. Plaintiff did not, however, fill out an accident report because she thought it was enough that Pam Polk knew about the injury.
9. During the next several weeks after her fall, plaintiff's knee became more painful and was swollen. Throughout this time, plaintiff occasionally discussed her injury with Tommy Shore, a supervisor.
10. Plaintiff first saw a doctor, Dr. Worf, at Salem Family Practice, about her knee on December 28, 1998. At the time, her knee was swollen and painful. When Dr. Worf asked plaintiff why her knee was swollen, plaintiff said she did not know, because she was not sure whether the knee was swollen because of her fall or because of the strain she had to put on it at work. Dr. Worf recommended that plaintiff see a specialist for her knee and took plaintiff out of work for two weeks.
11. Plaintiff had previously seen an assistant at Dr. Worf's office on December 16, 1998 and not mentioned the knee problem. However, plaintiff had come in for a pap and pelvic exam and had her mind on that. She also had swelling below her right nipple and a history of breast surgery.
12. Plaintiff was next seen on January 6, 1999, by Dr. Timothy McGowen, who practices with Drs. Charles Taft and Michael King at Orthopedic Specialists of the Carolinas. During that visit, plaintiff complained of having three months of right knee pain. Her intake sheet showed October 1, 1998 as the date her condition began. Dr. McGowen took x-rays, aspirated the knee and referred plaintiff to Dr. Taft for probable meniscal debridement.
13. On January 21, 1999, plaintiff continued her treatment with Dr. Taft. Dr. Taft noted tenderness along the medial joint line on the right side and about a 5 cc effusion, and he recommended arthroscopy.
14. Plaintiff consistently attributed her right knee problems to an occurrence or fall at work on about October 1, 1998. In addition to her relating to Dr. McGowen that she had knee pain for the past three months, a disability note contained in plaintiff's file with Dr. Taft's office, and dated January 25, 1999, states her date of injury as October 1, 1998.
15. Plaintiff first made a written report of her injury on January 22, 1999 when she completed a company short-term disability form, stating that she "fell while at work." Plaintiff submitted the request to Terri Hodges, defendant's Human Resource Coordinator. Additionally, a handwritten note in the employer's file, attached to Dr. Taft's January 21, 1999 out of work note, states, "This needs to be filed under short term disability. It may go W/C but that would take a while. Marlene." Marlene Markey was employed by defendant from February 1, 1999 until June 15, 2001 and was responsible for handling safety and health matters, workers' compensation matters and machine guarding.
16. On February 1, 1999, plaintiff's supervisor, Edith Davis (now Edith Holder), filled out an accident report for the October 1, 1998 fall. The report states that Pam Polk gave first aid. Mrs. Holder testified that the plaintiff had never mentioned the fall to her.
17. Defendant filed an Industrial Commission Form 19 with the Industrial Commission on February 4, 1999. The form, prepared by Terri Hodges, accurately describes what occurred on October 1, 1998, except that it states plaintiff fell over a mat instead of pipes.
18. Dr. Taft performed arthroscopic surgery on February 11, 1999. The surgery involved shaving the chondral defect of the medial femoral condyle and excision of medial synovial plica of the right knee. After the surgery, plaintiff continued to experience pain in her knee.
19. Defendant's workers' compensation administrator filed an Industrial Commission Form 61 with the Industrial Commission on February 11, 1999, denying the compensability of plaintiff's claim.
20. On March 2, 1999, plaintiff filed a claim for workers' compensation, Industrial Commission Form 18, for her October 1, 1998 injury by accident, with the North Carolina Industrial Commission.
21. At her May 7, 1999 doctor appointment, plaintiff told Dr. Taft she wanted to try to return to work. Plaintiff returned to work as a tool crib attendant on May 10, 1999. In his June 6, 1999 note, Dr. Taft noted that plaintiff was doing better with her knee and exercising.
22. Plaintiff had one additional visit with Dr. Taft on June 9, 1999. During that visit, plaintiff told Dr. Taft that she was "back at work distributing parts at the window at BE Aerospace." She also described her injury to Dr. Taft as catching her left foot in a pipe and falling forward on her right knee.
23. Defendant's workers' compensation administrator filed an Industrial Commission Form 28B on June 8, 1999 stating that $211.53 in medical expenses was paid on plaintiff's October 1, 1998 injury. There is a handwritten note on the document, stating "denied claim."
24. Plaintiff next sought medical treatment for her knee on August 16, 1999, when she had an appointment with Dr. Michael King. Dr. King noted that plaintiff was injured when she walked away from a window after waiting on a customer and fell. He also noted plaintiff continued to experience residual weakness, pain and mild effusion after her surgery. Dr. King referred plaintiff for physical therapy at HealthSouth. Plaintiff's intake sheet on that day again showed an injury date of October 1, 1998, including a description of the accident. It is also noted on the sheet that plaintiff has suffered depression "after [her] knee trouble started."
25. Plaintiff continued to have swelling and pain in her left knee following discharge from physical therapy at Health South in October 1999. In September, 2000, plaintiff's insurance changed and she began seeing Dr. Lisa Gholston as a family doctor. Plaintiff was still having pain and swelling in the knees. Dr. Gholston had plaintiff see Dr. Walter Ezeigbo, a sports doctor. Dr. Ezeigbo sent plaintiff back to see Dr. King.
26. Plaintiff saw Dr. King on October 11, 2000, and Dr. King noted that there was no improvement in the right knee. Her MRI showed tears of the anterior cruciate ligament, and medial meniscus and osteochondral fractures. It was Dr. King's professional opinion on that date that plaintiff's "present findings are due to the fall in 1998." The condition in plaintiff's knee was severe. Dr. King recommended arthroscopic surgery and a possible total knee replacement in the future. In his deposition, Dr. Taft agreed with Dr. King's position.
27. Plaintiff underwent surgery by Dr. King on November 30, 2000. Dr. King performed a medial menisectomy, a thermal modification to tighten the anterior cruciate ligament, and an abrasion arthroplasty of the lateral femoral condyle. The problems Dr. King found during the surgery, as well as lack of physical exercise to the muscles, continue to account for plaintiff's knee problems. Plaintiff was out of work after the surgery.
28. Dr. King ordered plaintiff to undergo physical therapy on January 4, 2001. He noted that plaintiff had a very good attitude. He also noted that her job required standing and that, "because of her intraarticular and articular damage, it is not a good idea to send her back too soon, and she should have twelve visits of PT."
29. At plaintiff's March 5, 2001 visit, Dr. King released plaintiff to return to work on March 19, 2001. He noted during that visit that plaintiff had a very blunt affect. This was noted again at her July 12, 2001 visit.
30. Plaintiff returned to work on March 26, 2001, following a one week vacation, in the subassembly department. The subassembly job involved some sitting, some standing, walking and lifting. The other employees in the department helped plaintiff when she had difficulty performing her job duties due to the pain in her knee.
31. Dr. King removed plaintiff from work again on May 14, 2001 because he felt "she could not spend the time at work and also spend the proper amount of time rehabilitating her knee with an exercise program." Because plaintiff's knee will worsen over time, she may be a candidate for total knee replacement in the future.
32. Plaintiff had no new injuries to her knee after her October 1, 1998 accident.
33. Although plaintiff had not exercised as much as Dr. King's average patient, she did, many times, participate in physical therapy and, some of her lack of exercise was attributable to her severe pain. Because of insurance restrictions, many patients now have to take responsibility to perform rehabilitative exercises at home. Dr. King has found it difficult to motivate patients to do this on their own.
34. Dr. King's opinion is that plaintiff's fall was the direct cause of the problems in plaintiff's knee and necessitated the surgery by himself and Dr. Taft, as well as plaintiff's radiological studies, physical therapy and medications. The findings that indicated that the cause of knee problems was traumatic were the injuries to the articular cartilage of the medial femoral condyle and damage to the lateral femoral condyle. The findings made by Dr. Taft could not have been the result of degenerative changes.
35. Any difference between Dr. King's and Dr. Taft's findings are due to the natural progression in plaintiff's problems since being treated by Dr. Taft. Based on his knowledge of plaintiff, Dr. King did not believe there was any intervening event that caused additional damage to plaintiff's knee since her accident.
36. Plaintiff attended an independent medical examination, at defendant's request, by Dr. Mark Yates at Piedmont Orthopedics on May 23, 2001. Dr. Yates' note states plaintiff has a history of right medial knee pain after she fell at work on October 1, 1998. Dr. Yates felt plaintiff would benefit from further physical therapy and referred her back to Dr. King.
37. Although plaintiff's explanation of her accident to her treating physicians is somewhat difficult to follow, by the greater weight of the competent evidence, the Full Commission accepts plaintiff's testimony in its totality as credible and finds that on or about October 1, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant, when she tripped on some pipes and fell, injuring her right knee and left elbow. Plaintiff's October 1, 1998 injury by accident caused internal derangement of her right knee, including anterior cruciate ligament injury, medical meniscus injury and osteochondral fractures of the femoral condyles, which caused pain and swelling and for which Dr. Taft and Dr. King subsequently performed surgeries.
38. As a result of plaintiff's injury by accident on or about October 1, 1998, plaintiff was unable to work in any capacity from January 21, 1999 through May 9, 1999, from November 29, 2000 through March 18, 2001 and from May 14, 2001 through at least the date of the hearing and up to and including October 1, 2001. Dr. King testified in his deposition that he expected to release plaintiff to return to work as of October 2, 2001; however there is no further evidence in the record that the plaintiff was in fact released to return to work, or any other evidence of her work status and ability to earn wages after October 1, 2001.
39. Plaintiff did not provide the defendant with written notice of her injury within thirty days because plaintiff thought it was sufficient that she informed Pam Polk, a member of the defendant's emergency response team, of her fall, because plaintiff did not initially realize the severity of her injury and because plaintiff did not realize how important it was to fill out a written report. Moreover, defendant's supervisors had actual knowledge of the injury when it occurred. Plaintiff's failure to provide written notice within thirty days resulted in no prejudice to defendant.
40. Defendant paid short-term disability benefits to plaintiff under a plan funded solely by defendant of $240 per week from January 21, 1999 through May 9, 1999, $280 per week from November 29, 2000 through March 18, 2001 and $290 per week from May 14, 2001 through at least August 9, 2001, the date of plaintiff's hearing.
41. The studies, procedures and treatment by the physicians at Orthopedic Specialists of the Carolinas, including Drs. Taft and King, and by Drs. Gholston and Ezgeibo for plaintiff's right knee were reasonably required to evaluate and provide relief from plaintiff's injury by accident on or about October 1, 1998. Defendant is therefore obligated to pay for this treatment.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On or about October 1, 1998, plaintiff sustained an injury by accident to her right knee and left elbow arising out of and in the course of her employment with defendant. N.C.G.S. § 97-22(6).
2. Plaintiff's failure to given written notice to the defendant of her injury within 30 days of its occurrence was reasonable, did not prejudice defendant, and is excused. N.C.G.S. § 97-22.
3. Plaintiff's average weekly wage is $758.73, yielding a compensation rate of $505.85. N.C.G.S. § 97-2(5).
4. As a result of her injury, plaintiff is entitled to compensation for temporary total disability at the rate $505.85 per week from January 21, 1999 through May 9, 1999, from November 29, 2000 through March 18, 2001, and from May 14, 2001 through October 1, 2001. Plaintiff may be entitled to further compensation after October 1, 2001, pending further evidence regarding her ability to earn wages after this date. N.C.G.S. § 97-29.
5. Defendant is entitled to a credit for the weekly short term disability payments paid plaintiff against the workers' compensation awarded plaintiff for temporary total disability for the same time period. N.C.G.S. § 97-42.
6. Plaintiff is entitled to payment of all medical expenses incurred as a result of her injury by accident. N.C.G.S. § 97-25.
7. The issue of the compensation to which plaintiff is entitled for temporary or permanent disability following October 1, 2001, when evidence was last received from plaintiff's treating physician, Dr. Michael King, is reserved for future decision.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $505.85 per week from January 21, 1999 through May 9, 1999, from November 29, 2000 through March 18, 2001, and from May 14, 2001 through October 1, 2001. This compensation, however, is subject to a credit for the short-term disability payments made to plaintiff during these same periods.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of her compensable injury on or about October 1, 1998.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded under Paragraph 1 of this AWARD is hereby approved for plaintiff's counsel. Said amount shall be deducted from the sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendant shall pay the costs due the Commission.
This the ___ day of March 2003.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER